RICHARDSON *et al. v.* WOOLARD, Chancery Clerk.

(In Banc. Oct. 29, 1923.)

[97 So. 808.   No. 23396.]

RECORDS.  *Loose-leaf book held "well-bound book" within statute.*
  A loose-leaf book with holes in the loose sheets, which fit over metallic posts, and become firmly attached to the leather cover when locked with a key kept by the clerk, a permanent metallic rod being inserted after the book is filled with recorded matter, so that it cannot again be unlocked, *held* a "well-bound book" within the meaning of Code 1906, section 2808 (Hemingway's Code, section 2309), requiring the recording of instruments in a well-bound book, in view of Code 1906, section 318 (Hemingway's Code, section 3691).   (Affirmed by divided court.)

  ETHRIDGE, ANDERSON, and HOLDEN, JJ., dissenting.

APPEAL from chancery court of Bolivar county.
HON. G. E. WILLIAMS, Chancellor.

Bill by J. W. Richardson and others against P. B. Woolard, chancery clerk.   From a decree dissolving an injunction and dismissing the bill, complainants appeal. Affirmed.

*Shands, Elmore & Causey,* for appellants.

The question to be determined from the record is whether or not the loose-leaf book described in the original bill

is the kind of book required by the law to be used for recording deeds of trust and other such instruments.

Section 2808 of the Code of 1906, or so much thereof as pertains to this controversy, is as follows: "It shall be the duty of the clerk of the chancery court to whom any written instrument is delivered to be recorded, and which is properly recordable in his county, to record the same without delay in a well-bound book of good paper, to be provided by him for that purpose, etc."

So then we readily see the law imposes on the chancery clerk as one of his duties that he shall provide his office with a well-bound book of good paper and as a further duty, he is required to record without delay such instruments in this well-bound book when such instruments are properly recordable in his county.

We find the B. and C. Merriam Company Edition of the Webster's International Unabridged Dictionary, published in 1904, at page 166, defines "book" to mean "a collection of sheets of paper, or similar material, blank, written or printed, bound together; commonly, many folded and bound sheets containing continuous printing or writing."

In *Turbeville* v. *The State,* 56 Miss. 793, the court quotes from Worchester and defines a book to be a "collection of paper leaves sewed or bound, used for any kind of writing."

In *Coffey et al* v. *Hendrick, et al.,* 65 S. W. 127, the supreme court of Kentucky adopted the meaning of the word "book" as used in the standard dictionaries, and said: "The standard dictionaries define a book to be a number of sheets of paper, bound or stitched together, whether printed or blank."

At this time we direct the attention of the court to a decision from the supreme court of California, styled Cady v. Purser, reported in 83 Am. St. Rep. page 391, wherein the court said: "The word 'recorded' in ordinary usage signifies copied or transcribed into some permanent book. In Anderson's Law Dictionary the term 'recording' is defined 'copying an instrument into the public records in a

book kept for that purpose by or under the superinten-
dence of the officer appointed therefor."

The legislature has never passed a law which permits
a chancery clerk to record a deed on a loose sheet of paper.
If the provisions of the law were such, the clerk could
transcribe a deed on a sheet of paper, and he could place
the sheet in a file or in a pigeon hole, or hang it somewhere
on a nail, and that would be a county record, but the
legislature has provided otherwise. He is required to
transcribe the instrument in a "book" and it must be a
well-bound book.

We find in the dictionaries and law books the definition
of certain articles known as books. As an example, under
the copyright laws and under patent laws, sheets of
music and pamphlets are sometimes construed by the
courts to be books, but we do not think such articles may
be called books within the statutes making provision for
the preservation of deeds, wills and other such instruments.

*Clark, Roberts & Hallam,* for appellee.

All persons have access to instruments filed with the
chancery clerk. The mere filing of the instrument is no-
tice to the world of its contents; and if a person desires
to know those contents, he must go to the original if not
recorded.

We do not believe, as claimed by counsel for the appel-
lants, that the purpose of the legislature in requiring a
well-bound book was solely to prevent the leaves of the
book containing recorded matter from being removed;
but we believe that the main purpose was to preserve a
record of conveyances, mortgages, etc., so that the exact
state of the title of property may be ascertained by the
living and by generations yet to come. The less suscepti-
ble the binding to the action of the elements, the more
durable the book will be; and thus, the purpose of the
legislature will be best subserved and the expense of re-

binding minimized. The fears entertained by counsel for the appellants have, therefore, no well-founded base.

It is a matter of common knowledge that practically all of the court clerks throughout the state have construed the statute in question to permit of the use of the book in question here. The statute merely prescribed a well-bound book. No specifications are given. It may be bound with leather or thread or, as here, with steel. If the construction placed on this statute by the various clerks is not correct, then the judgments of courts, including the supreme court (which we understand uses loose-leaf minute books) and the state of the title to lands in Mississippi for several years past, are in a deplorable state. There are in fact no judgments and no land records in most of the counties for those years. Knowing that a great majority of the chancery court clerks of the state use the loose-leaf record books, we took the trouble to write each one of them to ascertain what the percentage was. Out of sixty replies received it was stated in forty-nine that the loose-leaf record books were in use, while eleven stated that they did not use them. In other words, about five-sixths of the chancery clerks use the loose-leaf while one-sixth of them do not use them.

That the industry of counsel for the appellant has been unable (as appears from their brief) to uncover a single decision of any court applicable to the case at bar, is some evidence of the paucity of authority on the subject. A book is a collection of sheets bound together. They may be well or ill-bound. Our statute requires that the book shall be well bound; but the statute is silent as to the means of binding or the material to be used. It is common knowledge that—"There are various known methods of binding, as by binding by a clamp, by glue or paste, or by pressure, as well as by sewing or stitching," as was shown by the evidence in the case of *Kitchen* v. *Levison* (188 Fed. 658).

COOK, J., delivered the opinion of the court.

The appellants filed a bill of complaint, seeking an injunction to restrain the appellee, chancery clerk of Bolivar county, from recording a deed of trust on land in a book in his office commonly known as a loose-leaf record of land mortgages and deeds of trust, and a temporary injunction was granted. The appellee, defendant in the court below, demurred to the bill, on the ground that the bill showed on its face that the record book described therein was a well-bound book of good paper, and that the use of such a book by the chancery clerk was a full compliance with the law with reference to such records. The cause having been heard on bill and demurrer and motion to dissolve the injunction, a decree was entered thereon dissolving the injunction and dismissing the bill, and from this decree this appeal was prosecuted.

The loose-leaf book upon which the chancery clerk proposed to record the deed of trust is described in the bill of complaint as follows:

"Said loose-leaf book has six hundred loose sheets with three oblong holes on the inside of each sheet, which holes fit over metallic posts, and said sheets become firmly attached to the leather cover when locked, as stated below. After these sheets are placed over these posts, a metallic rod is run through the holes in the posts, and at the end of this rod is a key-hole into which a key fits; and, by turning the key, the mechanism may be locked or unlocked at any time while the book is being filled with recording matter. The key is kept by the clerk, and the book cannot be opened without it. As each instrument which is to be recorded is filed, the clerk, under the clerk's custom, unlocks the book, removes one of the blank sheets (the book being again locked in the meantime, and the key removed and retained by the clerk), records the instrument on the blank sheet, then unlocks the book, places the sheet with the recorded instrument on it therein, locks the book

again, and removes the key.    After all the sheets of the
book are filled with recorded matter, the clerk unlocks the
book by means of the aforesaid key, removes the afore-
said temporary rod, which temporary rod is only for use
while filing the book, and inserts in the mechanism through
the aforesaid posts another and permanent metallic rod,
to which there is no key, and which locks automatically
upon being inserted.    When the temporary rod as aforesaid
is inserted in the posts, and the key turned and removed
by the clerk as aforesaid, said six hundred leaves are
hereby firmly bound within the aforesaid leather covers,
and cannot be removed until the said key is inserted and
the mechanism thereby unlocked.    When the permanent
rod is inserted, it likewise binds the leather covers firmly
to the sheets within, and can never be unlocked or the
sheets removed."

Section 2808, Code of 1906 (section 2309, Hemingway's
Code) provides that "it shall be the duty of the clerk of
the chancery court to whom any written instrument is
delivered to be recorded, and which is properly record-
able in his county, to record the same without delay in
a well-bound book of good paper, to be provided by him
for that purpose," etc., and the only question presented
for decision by this record is whether or not the loose-
leaf book described in the bill is the kind of book required
by this statute to be used for recording deeds of trust and
other such instruments.

The principal argument advanced against the right to
use the loose-leaf book described in the bill is based upon
the fact that, until the book is completely filled with re-
corded instruments, the custodian thereof may, by the use
of a key, unlock the locking device with which the book
is bound together, and then remove therefrom a sheet or
page of the book.    In providing that it shall be the duty
of the clerk to whom any written instrument is delivered
to be recorded, and which is recordable in his county, to
record the same in "a well-bound book" of good paper, to

be provided by him for that purpose, the legislature had a twofold purpose. It was not the intention solely to prevent the leaves of the book containing recorded matter from being removed by some person with sinister design, but it was also the purpose to provide a book of such durable, binding and material that the recorded instruments will be preserved from loss or destruction by use or decay. That the legislature recognized that record books, although bound in the old style with glue or paste or by sewing and stitching with thread, may be injured or destroyed by long use or the ravages of time and decay, is shown by section 318, Code of 1906 (section 3691, Hemingway's Code), which makes it the duty of the board of supervisors to have rebound all record books of conveyances and of last wills and testaments, of indexes thereto, and all other record books of the county that need to be rebound, and to have transcribed into new record books all conveyances and other instruments of record, and indexes thereto, that need to be transcribed for preservation. It can hardly be doubted that a book bound with metal in the manner described in the bill of complaint, when locked, is more durable than one bound in the old style, and it is averred in the bill that the book remains at all times locked, except when opened temporarily by the clerk himself for the purpose of removing a blank page upon which it is desired to record an instrument. The clerk is the custodian of this book, and is responsible for its proper preservation, and the averments of the bill are that the key to the locking device is kept by the clerk, and the book cannot be unlocked so as to release a sheet without this key, and when an instrument which is to be recorded is filed, the clerk unlocks the book, removes one of the blank sheets (the book being again locked in the meantime, and the key removed and retained by the clerk), then records the instrument on the blank sheet, unlocks the book, replaces the sheet with the recorded instrument on it therein, again locks the book, and removes the key. When the

clerk removes a sheet from this book for the purpose of transcribing thereon an instrument which has been filed for record, and which he is required to record, the recordation of such instrument is not completed until the sheet is replaced in its proper place in the book, and bound therein. The unrecorded instrument is filed with and instrusted to the clerk, and he is responsible for the preservation thereof from the time it is filed. He is likewise the custodian of these record books, and is responsible for the preservation of them intact, and some trust and confidence must be reposed in him for the faithful discharge of these duties. It is hardly probable that a sheet could be removed from or substituted in the book described in the bill of complaint, except by the clerk or some one acting in collusion with him, and we do not think the danger of the spoliation of a record is any greater with the book here in question in use than it is with a book bound with glue or thread, or any other method of binding commonly in use. We are therefore of the opinion that the book here in question is a well-bound book within the meaning of the statute. In this view Judges SYKES and SMITH concur, while Judges ANDERSON, ETHRIDGE, and HOLDEN dissent.

The decree of the court below will therefore be affirmed.

*Affirmed.*

ETHRIDGE, J. (dissenting).

I cannot agree that a loose-leaf book is a well-bound book. The very terms "well-bound book" carry the idea that the leaves of the book are substantially and securely fastened together in such a way as leaves therefrom cannot be removed. This court, in *Turbeville* v. *State,* 56 Miss. 793, had before it the question as to whether the assessment rolls of the county was a book of accounts within the meaning of the Code, which declared that every person shall be guilty of forgery, who, with intent to defraud shall make any false entry or shall falsely alter any entry

made in the book of accounts kept in the office of the auditor of public accounts or in any other public office, by which any demand, either against or in favor of the state or any county or town or any individual, shall be or purport to be discharged, diminished, or in any manner affected. At page 798 of 56 Miss. of the above report the court said:

"The court below rightly ruled that the assessment lists, usually called 'rolls,' constituted 'a book of accounts.' It was proved to be, in form, 'a book,' one of the definitions of which, as given by Worcester, is, 'a collection of paper leaves, sewed or bound, used for any knd of writing.' That it is used, by law, for keeping the accounts of the municipality against the taxpayers, as well as to show the state of accounts between the city and its collector, we know officially, as well as by the proof in the record; so that, in every point of view, the court properly ruled that, within the intendment of the statute, the assessment roll was 'a book of accounts.'"

In the G. & C. Merriam Company edition of Webster's International Unabridged Dictionary, published in 1904, at page 166, the term "book" is defined to mean: "A collection of sheets of paper, or of similar material, blank, written or printed, bound together." This is the general understanding of the term "book" as used in reference to the recording acts and similar books.

The attorney-general, on the 27th of June, 1916, in an opinion to Clay county, dealt with the subject, and held that loose-leaf books could not be used in reference to any of the records required to be kept in a well-bound book. After referring to sections 349, 526, 527, 697, and 2808, Code of 1906, he said:

"Construing all of the foregoing sections together, as well as the duties imposed by law upon the circuit and chancery clerks with reference to the manner of keeping books containing public records, and keeping in mind the provisions of Senate Bill No. 280 of the Laws of 1916, I

am clearly of the opinion that it is in violation of the law for chancery clerks to record instruments required to be recorded, or minutes of the courts or supervisors, upon loose-leaf records which are to be inserted into a frame, and thus fastened together in book form. I do not think it was intended by the law that such records heretofore mentioned required to be kept and recorded by chancery and circuit clerks should be kept or recorded upon loose-leaves to be placed in a book form. On the contrary, I think it was the manifest purpose, spirit, and intention of the law that all such instruments of a public nature should be filed and recorded in well-bound books to be provided for that purpose. It makes no difference and does not alter the purpose of the law that it is more convenient to keep such records and record such instruments upon loose leaves. Certainly it was the intention of the legislature that all such records should be kept in permanent, well-bound books. The reason for this doubtless was that the legislature knew that it would be easy for any one to substitute such records or add to them by taking out certain leaves and inserting other leaves. It was intended to safeguard and protect the public records of the county from danger from this source, and to require all public records and documents to be kept in permanent, well-bound books and volumes, which could not be either added to or taken from, and therefore are not susceptible to fraud." Atty. Gen. Rep. 1915-1917, p. 328.

It seems to me that this conclusion is absolutely sound, and that the greatest mischief will result to the public from permitting the use of loose-leaf books with reference to most of the records kept for the purpose of protecting the public rights. Under the system described in the *per curiam* opinion the pages of the book may be removed at pleasure by the custodian of such record, or any other person who might get possession of the key or unlocking device, and records might be substituted and altered in such a way as to vitally affect the interest of any person

whose property or rights were affected by such record. The minutes of the board of supervisors containing the orders of the board in allowing expenditures out of the county treasury could be so manipulated by a designing person as to take thousands of dollars from the public treasury under ostensible orders, which in fact had never been made. One record book of the size described in this pleading would contain the orders of the board of supervisors for many months, during all of which time the book could be unlocked, and pages taken therefrom, and new pages substituted in such a manner as to commit the greatest fraud upon the public. The same is true of the minutes of the circuit and chancery courts, or of any other court of record, and of the accounts of the various county officers, or state officers, or municipal officers required to be kept by the county auditor, state auditor or the city auditor or any other agency which was keeping accounts against individuals, corporations, or subdivisions of the state. Instead of giving the protection afforded by a book securely and substantially bound, which could not be changed or altered without the disfigurement being plainly apparent, the whole matter would be intrusted to, the honesty of the custodian of the record, and in some cases dependent upon the degree of care which he exercised in keeping the unlocking device within his personal control. Such records and books would not be permanently bound until many months and perhaps many years after the transaction was had, and it would be utterly impossible to locate shortages and discrepancies on the part of those who might be dishonest or guilty of peculation. At the time these statutes were enacted it was never contemplated that any of the public records would be kept in any book other than one well-bound or stitched in such manner as to prevent the substitution of pages.

If the legislature should be of the opinion that the loose-leaf system ought to be adopted, it would be an easy matter for it to reach that result by so providing, but it appears

to me as a far-fetched and strained construction of the statute, as it now exists, to hold that a loose-leaf book is a well-bound book.

ANDERSON and HOLDEN, JJ., concur in this dissent.